Alabama & Vicksburg Railway Co. *v.* J. W. Lowry.

[57 South. 289.]

Carriers. *Check for corpse. Damages. Evidence.*

In a suit for actual and exemplary damages against a railroad for the wrongful refusal of its conductor to accept a check for a corpse, given to a passenger accompanying the corpse, by the station agent on the purchase of a ticket, the evidence adduced held not to show such willful or wanton misconduct as to warrant the imposition of punitive damages.

Appeal from the circuit court of Lauderdale county. Hon. John L. Buckley, Judge.

Suit by J. W. Lowry against the Alabama & Vicksburg Railway Company et al. From a judgment awarding actual and punitive damages the defendant appeals.

The appellee took passage over the Illinois Central Railroad at Grenada, Mississippi via Jackson, and over the appellant's road, the Alabama & Vicksburg Railway, to Meridian. He took with him the body of his child, and purchased a full ticket at Grenada through to Merid-

ian for the corpse. The agent at Grenada took up the ticket and gave him a check through to Meridian, and gave the appellee a duplicate check. At Jackson, appellee changed cars for Meridian, and the conductor on the Alabama & Vicksburg Railway declined to accept the check as transportation for the corpse, but demanded cash fare, which the appellee paid, amounting to two dollars and ninety cents.

The rules of the Illinois Central Railroad, operating from Grenada to Jackson, contain the following provision: "One adult first-class ticket must be presented for the transportation of a corpse, regardless of the age of the deceased, and a corpse must not be received for shipment except accompanied by an escort holding proper transportation to destination. The word 'corpse' must be plainly written on the face of the local, and on each coupon of interline ticket. . . . Corpses may be checked to points on and via the following lines only: [Here follow the names of a number of railroads, but not the name of the appellant, Alabama & Vicksburg Railway.] Stamp the escort ticket, or indorse with pen and ink: 'This ticket will not be honored for passage unless presented with excess baggage check Form ——.' . . . If a corpse is destined to a point on other lines than those mentioned above, lift the coupons and check only to the junction point of such lines, instructing the escort to present duplicate at such point and arrange for the care of the corpse beyond, in accordance with the rules of lines over which ticket reads to destination."

The joint rule of the Alabama & Vicksburg Railway and the Illinois Central Railroad contains the following provision: "Rules and regulations. 25. Transportation of Corpses in Baggage Cars.—A corpse, presented with requisite certificates issued in conformity with the rules of the national, state and local boards of health, will be transported in baggage cars, provided an escort traveling by the same train accompanies the corpse to its des-

tination. Such escort will be required to present, for the transportation of the corpse, one adult first-class ticket (the contract and each coupon of which must be plainly stamped 'Corpse,') in addition to the ticket for said escort. The ticket for the transportation of a corpse must be either a regular one-way ticket or the return portion of a round-trick ticket."

One of the rules of the Alabama & Vicksburg Railway is as follows: "534. They must not receive a corpse without a physician's certificate that it is free from contagion. Must be securely enclosed in a box, accompanied by a first-class ticket, which must be handed to the conductor. Must also be accompanied by a passenger. See Form 9393."

The appellee, who was complainant below, claims that the conductor was rude and insulting in his manner when refusing to take the excess baggage check for the corpse, and demanded the payment of cash fare therefor. This is denied by the defendant, and it is claimed that the conductor, acting only within the rules of the company, could not, under said rules, accept a check, but could accept only a first-class full-fare ticket.

Appellee brought suit against the Illinois Central and Alabama & Vicksburg Railway Companies for two dollars and ninety cents actual damages and five thousand dollars punitive damages. The Illinois Central Railroad demurred, and the demurrer was sustained, and the suit dismissed as to that road. The appellee recovered a verdict against the appellee for five hundred dollars, and from a judgment for that amount this appeal is taken.

The appellee testified in part as follows: "Q. When he reached you, Mr. Lowry, just in your own way, tell the jury all that occurred and how it occurred. A. When he got to me, why I gave him the regular ticket that I had. Q. That was for your wife? A. Yes, sir; that was for my wife. I showed him the check, and the certificate given by the undertaker, and signed by the phy-

sician at Grenada, and also paid two dollars and ninety cents, my fare. Q. That was your fare? A. That was my fare. Q. From where? A. From Jackson to Meridian. And he said that the check couldn't be honored on this road, and I told him I paid for the corpse through from Grenada to Meridian, had it checked through, that was the check for it; and he says, 'Well, see, I can't honor that check at all.' Says, 'Some roads do one way, and some another.' And says, 'I can't honor that.' In my condition, I didn't know what to do. I had my baby in my arms there, and, being under a strain as I was, I didn't know what to do. I paid him then. Q. Tell how he talked. A. He was very abrupt about it, in the way he demanded it. . . . Q. Tell how he talked (speaking of the conductor). A. He was very abrupt about it, in the way he demanded it. He demanded another fare, which was two dollars and ninety cents. He said a corpse took a regular fare—no half fares, but a regular fare. Q. Mr. Lowry, tell the court and jury what Mr. Wilson's manner was at the time he demanded this additional fare from you. A. It was a very abrupt manner. Q. What was the tone of his voice? A. Well, he demanded that I pay another fare, in a very harsh and gruff manner. I had my baby in my arms, and I didn't know what would occur if I didn't pay it. Q. Just detail, Mr. Lowry, everything that occurred there when Mr. Wilson reached where you were in the car and got the fare. Detail everything that occurred between you and Mr. Wilson, and everything how it occurred. A. When he got to me, I gave him the regular ticket I had from Grenada to Meridian, and paid him two dollars and ninety cents, and showed him my duplicate check that I had from Grenada to Meridian for the corpse, and also this certificate that was given by the undertaker, and he wouldn't accept the check, said I had to pay another fare, and that would be a regular fare, not half fare but a regular fare, for a corpse, and

he said it in a very rude way and manner, and I paid him the two dollars and ninety cents. I had my baby in my arms, and I paid him the two dollars and ninety cents rather than to have any further trouble. Q. What was Mr. Wilson's appearance at the time? Did he appear to be in a good humor, or was he mad, or how? A. He looked like he was mad, yes, sir; talked like that way. Q. Did his manner in which he talked to you about his fare indicate to you that he was mad? (Objected to and withdrawn.) Q. You say he appeared to be mad? A. Yes, sir. Q. How was that appearance indicated? A. By his actions, words, looks—his talk."

On cross-examination the appellee testified in part as follows: "Q. Mr. Fewell: Mr. Lowry, tell the court and jury what Mr. Wilson's manner was at the time he demanded this additional fare from you? A. It was a very abrupt manner. Q. What was the tone of his voice? A. Well, he demanded that I should pay another fare, in a very harsh and gruff manner. I had my baby in my arms, and I didn't know what would occur if I didn't pay it. Mr. Bozeman: We object to that, and move to strike it out. That is a mere speculation on the part of the witness, and not a fact at all. The Court: Go ahead. (To which action and ruling of the court the defendant then and there excepted.) Mr. Fewell: How long was he talking to you, Mr. Lowry? A. It wasn't very long. Q. Can you approximate it? A. About two or three minutes, I suppose. Q. You had the baby in your arms? A. Yes, sir. Q. You say, too, you sat down by somebody else. Who was that? A. Mrs. Harris. Q. Mrs. Robert Harris, here? A. Yes, sir. Q. When the conductor came through, you were sitting next to her? A. Yes, sir. Q. She was sitting next to the window, and you next to the aisle? A. Yes, sir. Q. Now, Mr. Lowry, when Mr. Wilson came to you, you say that you gave him the ticket. Now, that was your wife's ticket, was it? A. Yes, sir. Q. And that was the ticket that

you have identified here as Exhibit A to your testimony?
A. Yes, sir. Q. Now you had no ticket for yourself,
Mr. Lowry from Jackson to Meridian? A. No, sir; I
did not. Q. So Mr. Wilson asked you for the cash fare
for yourself, did he? A. Yes, sir. Q. And you paid him
that? A. I paid him the cash fare. Q. Two dollars and
ninety cents? A. Yes, sir. Q. Up to that time every-
thing was pleasant was it? A. Well, I suppose so, on
the train; but it wasn't with me. Q. I am not referring
to your grief now, that your child being dead? A. Yes,
sir. Q. I am talking about the dealings between you
and Mr. Wilson. As between you and Mr. Wilson there
was no disagreement or controversy up to that time?
A. No, sir. . . . Q. You then showed Mr. Wilson this
little red check here, marked 'Duplicate,' did you? A.
Yes, sir. Q. And that was the check you held for the
corpse? A. Yes, sir. Q. What did Mr. Wilson say
when you showed him that? A. He said he couldn't
accept it. Q. Did you make any reply to that? A. I
told him that I had bought the two regular tickets. I
had to buy two tickets in order to check the corpse
through. You can't check a corpse on one ticket. You
have to have two regular tickets. I had to give up one
of them for the check, the duplicate check. Q. You told
him that? A. I told him that. Q. What did he say in
answer to that? A. He said he couldn't honor it. Q.
Told you it wasn't good on that road, as you said a
while ago, didn't he? A. Yes, sir; he said some roads
had one way of doing, and some had another, and said
he couldn't accept it. Q. Did he tell you it was required
on the Alabama & Vicksburg road you should have a
first-class and full-fare ticket for the corpse, or pay a
full cash fare? A. Yes, sir; he made me pay the full
cash fare. He said that you couldn't take a corpse on a
half fare; it had to be a regular ticket. Q. And you
couldn't take it on the Alabama & Vicksburg road on a
check; that the check wouldn't pass? A. Yes, sir; he

said that the check wouldn't pass. Q. Did he tell you, Mr. Lowry, that he (the conductor) had no authority to carry the corpse on this ticket that you had here, and that he would have to ask you to pay the fare on it? A. Yes, sir; he made me pay the fare for the corpse. Q. Well, when you paid the fare, he went on collecting for other fares, did he—went on by you? A. Well, after we had the conversation; yes, sir.''

Cross-examination by counsel for appellant: ''Q. That during what we call the Christmas travel? A. Yes, sir. Q. Well, now, Mr. Lowry, Mr. Wilson, is a man with a low, quiet, manner and address, isn't he? A. At times, I suppose, sir. Q. I am talking about at that time? A. No, sir; he was not. Q. Mr. Wilson didn't say to you that if you didn't pay this fare that he would put you off did he? A. No, sir; he didn't say that in words; he intimated it, though. Q. You don't mean to tell the jury that Mr. Wilson was mad and abrupt and abusive about this thing, do you? You don't mean to tell the jury he was abrupt in asking you for this cash fare? A. Yes, sir; I considered him very abusive. Q. What did he say that you construed to be abusive? A. In the manner in which he demanded the other two dollars and ninety cents fare; the way he spoke it.''

*R. H. Thompson & A. S. Bozeman,* for appellant.

We confidently submit to this court:

1.  That the court below erred in refusing the second instruction asked by the appellee and refused by the court; that under the evidence in this case the plaintiff was not entitled to recover any punitive damages from the defendant.

2.  That the court below erred in giving to the plaintiff the fourth, seventh and eighth instructions, authorizing the infliction of punitive damages against the defendant.

3.  That the verdict being for punitive damages is unwarranted by the testimony.

There is not, in this case, any "insultingly sinister implication" in the words or manner of the conductor, as there was in the case of *Railroad* v. *Reid,* 93 Miss. 458, as the majority of this court construed the act of the conductor in pitching the ticket back into the lap of Reid, with the words, "I have heard that before."

Nor was there any willful or wanton refusal of the conductor to hear the appellee's explanation.

On the contrary, in this case, the conductor did hear the appellee's explanations, and courteously advised him that he, nevertheless, was unable to honor the check, and explained to the appellee that some roads checked corpses and others did not.

There was no rude and insulting awakening of a lady passenger, in the nighttime, with a threat to put her off the train if she did not pay her fare, no insulting warning that "You needn't try to bluff me," as there was in the case of *Railroad Co.* v. *Fitzgerald,* 96 Miss. 197, also decided by a divided court.

Nor was there anything in the conversation between the appellee and the conductor which can fairly be characterized as rude and insulting.

Taking the appellee's testimony most strongly in his favor, and that the conductor's voice was gruff and his manner rude (though this is contradicted by both the conductor and Mrs. Harris, the only disinterested witness), this is not sufficient to support a verdict for punitive damages.

Here was a case of a crowded train, the conductor handling five hundred and six hundred passengers, during the holiday travel, when his duties were numerous and pressing, and when he did not have time to argue or discuss the matter with the appellee at great length, even if the appellee had so desired, yet he took two or three minutes to explain to appellee that he could not honor the check.

Mere brusqueness in the words or manner or voice of the conductor towards a passenger, is not an insult which

justifies the infliction of punitive damages against the company. *Railroad Co.* v. *Gill,* 66 Miss. 39.

And certainly the fact that a man talks with a gruff and harsh voice should not inflict punitive damages upon his employer. *Railroad Co.* v. *Brookhaven Machine Co.,* 71 Miss. 663.

Under the above authorities we submit that the court below erred in giving instructions 7 and 8 asked by the appellee.

By the 7th instruction the court charged the jury that if the conduct of the conductor toward the appellee was characterized by rudeness or insult, or abuse, or gross carelessness, or willful wrong, they might inflict punitive damages.

*Fewell & Cameron,* for appellee.

All that the defendant company wanted, and had a right to demand, was the fare for the corpse from Jackson to Meridian, and this it had in fact already received, and the conductor could assuredly have advised himself of the same, and the appellant admitted this by producing in this court the original coupon ticket purchased by appellee at Grenada. But this corporation is not satisfied in having one cash fare for the corpse, but demanded of appellee the payment of an additional cash fare, in the manner testified to, and even came into court with the appellee's money in their pocket that they had no right to obtain, and refused to even tender the two dollars and ninety cents on the trial of this case, and they have never even made an effort to offer appellee the payment of this two dollars and ninety cents of his own money which they have had all these months.

In conclusion, we think the cases of *I. C. Railroad* v. *Reed,* 93 Miss. 455; *I. C. Railroad* v. *Harper,* 93 Miss. 560; *Forsee* v. *Alabama, etc. R. R. Company,* 63 Miss. 66; *Y. & M. V. Ry. Company* v. *Williams,* 87 Miss. 344; *Railroad Company* v. *Fitzgerald,* 96 Miss. 197; *Railroad*

*Company* v. *Riley,* 68 Miss. 765; and *I. C. Railroad Company* v. *Holmes,* 75 Miss. 371, in point, and we feel confident upon careful perusal of the testimony, and consideration of the above cases, that this court will hold that the question of insult, etc., was properly submitted to the jury, and that this court will not disturb a verdict for so reasonable a sum as was given by the jury in this case. We do respectfully submit that this case should be affirmed.

Whitfield, C.

The testimony in this record falls far short of showing a cause of action warranting the imposition of punitive damages.                              *Reversed and remanded.*

Per Curiam.   The above opinion is adopted as the opinion of the court, and for the reasons therein indicated the judgment is reversed, and the cause remanded.

Suggestion of error filed and overruled.